# EXHIBIT A – REDACTED

**BAKER BOTTS L.L.P.**
Wayne O. Stacy (*pro hac vice*)
wayne.stacy@bakerbotts.com
2001 Ross Avenue
Dallas, TX 75201
Telephone: 214.953.6678
Facsimile: 214.661.4678

Sarah J. Guske (SBN 232467)
sarah.guske@bakerbotts.com
J.B. Schiller (SBN 298747)
jb.schiller@bakerbotts.com
101 California St., Suite 3600
San Francisco, CA 94111
Telephone: 415.291.6200
Facsimile: 415.291.6300

Michelle J. Eber (*pro hac vice*)
michelle.eber@bakerbotts.com
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
Telephone: 713.229.1223
Facsimile: 713.229.7923

Attorneys for Plaintiff
TWILIO INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE

| TWILIO INC., | Case No. 5:16-CV-06925-LHK |
|---|---|
| Plaintiff, | **PLAINTIFF TWILIO INC.'S DAMAGES CONTENTIONS PURSUANT TO L.P.R. 3-8** |
| vs. | |
| TELESIGN CORPORATION, | **HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY** |
| Defendant. | |

BAKER BOTTS L.L.P.

Pursuant to the Federal Rules of Civil Procedure and Local Patent Rule 3-8 for the U.S. District Court for the Northern District of California, plaintiff Twilio, Inc. ("Twilio") hereby submits its damages contentions.

Based on facts currently available to Twilio, Twilio does not intend to seek damages in the form of lost profits or price erosion for TeleSign's infringement of U.S. Patent Nos. 8,306,021, 8,837,465, and 8,755,376 (the "Asserted Patents").

Twilio notes that discovery is in the early stages in this case, and Twilio reserves the right to amend, supplement, and/or update its damages contentions as identified herein. In particular, TeleSign alone is in possession of certain documents and information that Twilio would use in analyzing the proper theories and amounts of damages that are proper in this case. As one example, Twilio served Interrogatory No. 3 on TeleSign on March 21, 2017. That interrogatory asked TeleSign to "Describe all facts that relate to the determination of a reasonable royalty." TeleSign obtained a six-week extension to answer that interrogatory. Yet TeleSign has failed to identify any facts in response to Twilio's Interrogatory Number 3. *See* Exhibit A. Twilio notified TeleSign of this deficiency (among others in its interrogatory responses) in a letter dated June 11, 2017. *See* Exhibit B. To date, TeleSign has not supplemented its interrogatory response to provide any facts relating to the determination of a reasonable royalty.

As another example, Twilio served a Request for Production on TeleSign asking for "All documents related to the determination of a reasonable royalty." *See* Twilio Request for Production No. 13. Yet TeleSign stated that it "will not produce documents in response to this request." *See* Exhibit C (2017.05.01 TeleSign Responses to Twilio RFPs) (No. 13).

Further, only TeleSign has information on many factors relevant to the analysis of damages in this case, including documents relating to its comparable licenses, pricing strategy, pricing information, marketing analyses related to the accused and non-accused products, current and/or past customers of the accused and non-accused products, revenue attributable to the accused and non-accused products, per-unit revenue, cost, and profit information, TeleSign forecasts and projections relating to per-unit revenue, costs, and profits, competitive analyses,

BAKER BOTTS L.L.P.

1    and any available and viable non-infringing alternatives, for example.

2           Based on TeleSign's deficient discovery responses and document productions to date,

3    including those identified later in these contentions, Twilio is lacking necessary information it

4    needs to properly assess damages in this case.

5           Twilio reserves the right to amend, supplement, and/or update its damages contentions,

6    theories, and computations based on discovery in this case, including fact and expert discovery,

7    documents and information produced by TeleSign, TeleSign's responsive damages contentions,

8    TeleSign's responses to written discovery (including its response to Interrogatory No. 3), third

9    party information obtained through discovery, and expert opinions and analysis obtained during

10   the course of the case.

11          In particular, Twilio reserves the right to supplement or amend these contentions once

12   qualified experts have provided their opinions regarding the Asserted Patents, including the

13   proper amount of damages for TeleSign's infringement of those patents.  In particular, Twilio

14   disclosed a damages expert to TeleSign in this case on June 9 and followed up with counsel for

15   TeleSign on June 15.  *See* Exhibit D.  Twilio asked for TeleSign's consent to disclose its

16   confidential information to the expert on an expedited basis, but neither TeleSign's lead counsel

17   nor anyone else on TeleSign's counsel team would even respond to either of Twilio's emails.

18   *Id.*  Twilio contends that the opinion of its damages expert will be relevant to this analysis and

19   Twilio is unable to disclose any confidential TeleSign information to its retained damages expert

20   as of this date, due to TeleSign's failure to even respond to Twilio's email requests.

21   **I.    CATEGORIES OF DAMAGES TWILIO INTENDS TO SEEK FOR TELESIGN'S**
22   **PAST INFRINGEMENT AS OF THE JUDGMENT DATE**

23          Subject to the foregoing reservations, Twilio intends to seek "damages adequate to

24   compensate for the infringement, but in no event less than a reasonable royalty for the use made

25   of the invention by the infringer, together with interest and costs as fixed by the court" under 35

26   U.S.C. § 284 and *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116,

27   1119-20 (S.D.N.Y. 1970) to compensate for TeleSign's past infringement as of the date of

28   judgment in this action.  Twilio's analysis of the proper reasonable royalty, given the

BAKER BOTTS L.L.P.

information currently available to Twilio, is set forth below.  The below analysis does not include prejudgment or post-judgment interest.  Twilio intends to seek such interest and contends that the determination of prejudgment and post-judgment interest rates are a matter for the Court.  Further, Twilio will seek an accounting from TeleSign relating to damages from the date of Twilio's opening damages expert report through trial and from trial through the date of final judgment.

Further, Twilio intends to seek that its damages be increased, up to triple their amount, as of the date that TeleSign became a willful infringer.  *See, e.g., Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. __ (2016).  Based on the information Twilio currently possesses, Twilio contends that TeleSign has continued its infringing activities after receiving notice of the Asserted Patents and, therefore, such infringement is willful, entitling Twilio to the recovery of increased damages under 35 U.S.C. § 284. TeleSign became aware of the Asserted Patents and Twilio's products during its diligence in filing suit against Twilio. Furthermore, TeleSign's engineers had access to Twilio when TeleSign was a customer of Twilio. During that time, TeleSign's engineers were able to study Twilio's source code and the design of Twilio's products. For example, TeleSign's cofounder and Vice President of Product Strategy, Stacy Stubblefield, had a private Twilio account that was created in September of 2009. Through this account, Ms. Stubblefield gained access to Twilio's products.  Ms. Stubblefield used the information that she learned from her Twilio account to develop TeleSign's products in order to compete with Twilio.  After learning of Twilio's products, TeleSign designed competing products which closely match some of Twilio's products. As such, TeleSign's infringement of the Asserted Patents has been deliberate, flagrant, wanton, and constitutes willful infringement.

Twilio has served an interrogatory on TeleSign relating to its knowledge of the Asserted Patents (*see* Twilio Interrogatory No. 4), and TeleSign has failed to provide a complete answer to that interrogatory.  *See* Exhibit A.  Twilio also served an interrogatory on TeleSign relating to TeleSign's contention that it is not a willful infringer.  *Id.* TeleSign has failed to provide a complete answer to that interrogatory.  *Id.*  TeleSign has informed Twilio that it intends to supplement these responses.  Twilio reserves the right to amend and or supplement these

BAKER BOTTS L.L.P.

1  contentions based on additional information provided by TeleSign, any other information

2  acquired during discovery, and any expert opinions.

3  **II.   CATEGORIES OF DAMAGES TWILIO INTENDS TO SEEK FOR TELESIGN'S
      ONGOING INFRINGEMENT AS OF THE JUDGMENT DATE**

4

5  **A.   *Injunctive Relief***

6  For TeleSign's infringement as of the date of judgment in this action, Twilio intends to

7  seek a permanent injunction.  "The essential attribute of a patent grant is that it provides a right

8  to exclude competitors from infringing the patent." *Acumed LLC v. Stryker Corp.*, 551 F.3d

9  1323, 1328 (Fed. Cir. 2008). "Without the right to obtain an injunction, the right to exclude

10  granted to the patentee would only have a fraction of the value it was intended to have, and

11  would no longer be as great an incentive to engage in the toils of scientific and technological

12  research." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 547 (D.

13  Del. 2005) (citation omitted). As such, the Patent Act provides courts the power to protect the

14  patentee's right to exclude by granting injunctive relief, specifying that courts "may grant

15  injunctions in accordance with the principles of equity to prevent the violation of any right

16  secured by patent." 35 U.S.C. § 283.

17  The Supreme Court addressed and confirmed the long-standing test for the entry of

18  permanent injunctions in patent cases in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388

19  (2006). The eBay Court reaffirmed that an injunction requires the patentee showing:

20  (1) that it has suffered an irreparable injury;

21  (2) that remedies available at law, such as monetary damages, are inadequate to

22  compensate for that injury;

23  (3) that, considering the balance of hardships between the plaintiff and defendant,

24  a remedy in equity is warranted; and

25  (4) that the public interest would not be disserved by a permanent injunction.

26  *Id.* at 391.

27  Chief Justice Roberts, writing in concurrence in *eBay*, explained that the Court's opinion

28

BAKER BOTTS L.L.P.

did not signify "a major departure from the long tradition of equity practice" or that district courts were now "writing on an entirely clean slate." *Id*. at 395. He emphasized that "[f]rom at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases," a tradition "not surprising, given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to use an invention against the patentee's wishes." *Id*. (emphasis in original).   In this regard, and in keeping with the principle that like cases should be decided alike, Justice Roberts noted that "a page of history is worth a volume of logic" in applying the traditional principles of equity to grant injunctions when patent infringement is found. *Id*.

Agreeing, Justice Kennedy also in concurrence went further to circumscribe the two scenarios where the equities may balance against an injunction. First, an injunction may be unwarranted when it serves as nothing but "a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent." *Id*. at 396. That is, a company using a patent "not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees," will rarely prove that a remedy at law is inadequate. *Id*. Second, "[w]hen the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient…and an injunction may not serve the public interest." *Id*. at 396-97.

In applying the holding and reasoning from *eBay*, the Federal Circuit has noted that "the courts have a long history of remedying trespass on property rights—including patent rights—by removing the trespasser." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013). "Patent property rights are especially difficult to protect with solely monetary relief because a calculating infringer may thus decide to risk a delayed payment to obtain use of valuable property without the owner's permission." *Id*. "This wisdom is particularly apt in traditional cases, such as this, where the patentee and the adjudged infringer both practice the patented technology." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1150 (Fed. Cir. 2011).   Thus, "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude" and

"[f]acts relating to the nature of the competition between the parties are therefore undoubtedly [] relevant to the irreparable harm inquiry." *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-cv-457-JST (N.D. Cal. Sept. 22, 2015).

Twilio contends that (1) TeleSign's infringement has caused Twilio irreparable injury and will continue to cause such injury if permitted to continue; (2) monetary damages are inadequate to compensate for that injury; (3) considering the balance of hardships between Twilio and TeleSign, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction in this case. However, Twilio contends that permanent injunctions are not covered by Local Patent Rule 3-8 and therefore no additional detail regarding Twilio's contentions concerning a permanent injunction are required at this time.

### B.   *Monetary Relief, in the Alternative*

In the alternative, should the Court not grant a permanent injunction, Twilio intends to seek a reasonable royalty "together with interest and costs as fixed by the court" for TeleSign's infringement going forward as of the date of judgment in this case. *See*  35 U.S.C. § 284. Twilio's analysis of the proper reasonable royalty, given the information currently available to Twilio, is set forth below. The below analysis does not include prejudgment or post-judgment interest. Twilio intends to seek such interest and contends that the determination of prejudgment and post-judgment interest rates are a matter for the Court.

Further, Twilio intends to seek that its post-judgment damages be increased, up to triple their amount, as of the date that TeleSign became a willful infringer. *See, e.g., Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. __ (2016). Based on the information Twilio currently possesses, Twilio contends that TeleSign has continued its infringing activities after receiving notice of the Asserted Patents and, therefore, such infringement is willful, entitling Twilio to the recovery of increased damages under 35 U.S.C. § 284. TeleSign became aware of the Asserted Patents and Twilio's products during its diligence in filing suit against Twilio. Furthermore, TeleSign's engineers had access to Twilio when TeleSign was a customer of Twilio. During that time, TeleSign's engineers were able to study Twilio's source code and the design of Twilio's

1   products. For example, TeleSign's cofounder and Vice President of Product Strategy, Stacy

2   Stubblefield, had a private Twilio account that was created in September of 2009. Through this

3   account, Ms. Stubblefield gained access to Twilio's products.  Ms. Stubblefield used the

4   information that she learned from her Twilio account to develop TeleSign's products in order to

5   compete with Twilio.  After learning of Twilio's products, TeleSign designed competing

6   products which closely match some of Twilio's products.  As such, TeleSign's infringement of

7   the Asserted Patents has been deliberate, flagrant, wanton, and constitutes willful infringement.

8       Twilio has served an interrogatory on TeleSign relating to its knowledge of the Asserted

9   Patents (*see* Twilio Interrogatory No. 4), and TeleSign has failed to provide a complete answer

10  to that interrogatory.  *See* Exhibit A.  Twilio also served an interrogatory on TeleSign relating to

11  TeleSign's contention that it is not a willful infringer.  *Id.*  TeleSign has failed to provide a

12  complete answer to that interrogatory.  *Id.*  TeleSign has informed Twilio that it intends to

13  supplement these responses.

14      Twilio has also served several Requests for Production on TeleSign relating to

15  TeleSign's knowledge of the patents and its pre-suit actions with respect to Twilio.  For

16  example, TeleSign has agreed to "conduct a reasonable search and produce non-privileged

17  documents evidencing Stacy Stubblefield's analysis of the relevant Twilio products."  *See*

18  Exhibit C (2017.05.01 TeleSign Responses to Twilio's First Set of RFPs) (No. 1).  Further,

19  TeleSign has agreed to "conduct a reasonable search and produce non-privileged documents

20  evidencing analysis of the relevant Twilio products."  *Id.* at RFP No. 5.

21      Twilio reserves the right to amend and or supplement these contentions based on

22  additional information provided by TeleSign, any other information acquired during discovery,

23  and any expert opinions.

24  **III.   TWILIO'S FACTUAL SUPPORT FOR AND COMPUTATION OF DAMAGES
25         IN AN AMOUNT NO LESS THAN A REASONABLE ROYALTY**

26      Twilio's preliminary analysis of the proper reasonable royalty for TeleSign's

27  infringement of the Asserted Patents in this case under the *Georgia-Pacific* factors is set forth

28  below.  Twilio reserves the right to utilize any facts, analysis, or documents cited under a

BAKER BOTTS L.L.P.

particular factor below for other factors as well.

**A.** ***Georgia-Pacific Factor 1: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty"***

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Twilio contends that expert witnesses in this case will analyze the ████████████████ and may provide an opinion as to whether that agreement is related to comparable technology to the patents-in-suit and whether the agreement may be relevant to the analysis of the hypothetical negotiation.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

**B.** ***Georgia-Pacific Factor 2: "The rates paid by the licensee for the use of other patents comparable to the patent in suit"***

As of the date of these contentions, TeleSign has not produced any license agreements. Thus Twilio is not able to determine at this stage in the case what rate, if any, TeleSign has paid for the use of other patents comparable to the Asserted Patents.  Further, TeleSign has a patent portfolio of its own and Twilio is not in possession of any license agreements TeleSign has entered into concerning its own patents.

Based on Twilio's initial investigation to date, it appears that TeleSign has a number of partnerships with third parties, including Comodo; ████; Deepnet Security; ████████ RSA; ████ Mobile Mentor; ████████ ████████ BahavioSec; and Orange.  Twilio is not in possession of further information regarding these partnerships, including any licensing or technology transfer / sharing agreements that may have been executed, services / products

BAKER BOTTS L.L.P.

received or provided, and any related financial provisions.  This information may affect the analysis of a reasonable royalty under this factor.

Should TeleSign produce any license or technology transfer / sharing agreements including technologies comparable to the patented technology or should any such agreements otherwise become available during discovery, Twilio reserves the right to amend and supplement these contentions.  However, given that this information is solely in the possession of TeleSign, Twilio is unable to disclose, at this stage in the case, how this factor would affect a reasonable royalty for the Asserted Patents.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

**C.**   ***Georgia-Pacific Factor 3: "The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold"***

As part of a hypothetical negotiation, Twilio would offer TeleSign a non-exclusive, U.S. license for rights to the Asserted Patents. Such non-exclusive rights would provide TeleSign the necessary clearance to provide its customers with the Accused Products.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

**D.**   ***Georgia-Pacific Factor 4: "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly"***

From an economic perspective, if the patent holder has "an established policy … to maintain his patent monopoly by not licensing others," that presumably reflects a belief by the patent holder that it can earn more profits by exploiting its patent itself than by licensing it to others.  The presence of such a policy would suggest a somewhat higher reasonable royalty, holding all other factors constant.

Twilio does not have an established policy or marketing program relating to the licensing of the Asserted Patents.

BAKER BOTTS L.L.P.



Twilio contends that fact discovery is ongoing and expert discovery has not yet begun.  Twilio contends that expert witnesses in this case will analyze the ████████████████ and may provide an opinion as to whether that agreement is related to comparable technology to the patents-in-suit and whether the agreement may be relevant to the analysis of the hypothetical negotiation.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

**E.      *Georgia-Pacific Factor 5: "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter"***

As an economic matter, one would expect that, other things equal, a patent holder would charge higher royalty rates to a competitor than it would charge to a non-competitor.  To the extent Twilio and TeleSign are competitors in the market relevant to the Asserted Patents, this factor would tend to have an upward impact on the outcome of the hypothetical negotiation.

TeleSign has made numerous statements on the record relating to the competition between the parties.  For example, in co-pending litigation between the parties, TeleSign alleged that Twilio's marketing "is having a devastating effect on TeleSign's business," "TeleSign has been forced into a price war with Twilio," and "TeleSign's entire sales strategy and growth plans have been disrupted by Twilio's infringement."  Case No. 2:15-cv-03240-PSG-SS, Dkt. 21 (Aug. 5, 2015) at 2-3.  TeleSign alleged that Twilio offers its technology "to the same customers that TeleSign is targeting."  *Id.* at 3.  Further, TeleSign stated that "TeleSign and Twilio directly compete with one another for customers, and TeleSign is losing sales that could result in long-term customer relationships."  *Id.* at 12.  Further, TeleSign alleged:

BAKER BOTTS L.L.P.

TeleSign and Twilio market their products using the same channels, such as offering online information and demonstrations, attending conferences, and marketing to software- and website developers directly (e.g., using Twitter accounts), and through an enterprise-sales model. TeleSign and Twilio regularly meet with the same customers and potential customers on sales calls and during in-person meetings.

*Id.* Further, TeleSign alleged "TeleSign and Twilio will be competing aggressively for virtually all new customers for phone verification technology." *Id.* at 15.

In April 2017, TeleSign launched new product features and a press campaign targeted at Twilio. *See* D.I. 66-5. ████████████████████████████████████

████████████████

Twilio contends that the following documents may be relevant to the analysis under this factor: TLS_0006792, TLS_00008679, TLS_00015401, TLS_00015415, TLS_00015416, TLS_00015430, TLS_00015474, TLS_00015481, TLS_00015483, TLS_00015484, TLS_00015501, TLS_00015503, TLS_00015541, TLS_00015542, TLS_00020421, TLS_00020422, TLS_00020423, TLS_00020426, TLS_00020629, TLS_00009232, TLS_00009308, TLS_00009335, TLS_00009514, TLS_00012085, TLS_00012210, TLS_00012317, TLS_00012507.

TeleSign has refused to provide a complete answer to Twilio regarding the nature of the competition between Twilio and TeleSign. *See* Exhibit A (TeleSign's Response to Interrogatories) (No. 6); Exhibit B (June 11, 2017 letter from Wayne Stacy to TeleSign). TeleSign has informed Twilio that it intends to supplement this interrogatory response.

Twilio has also served several Requests for Production on TeleSign relating to competition between the parties. For example, TeleSign agreed to "produce documents evidencing competition analysis of the Accused Products and the relevant Twilio products." *See* Exhibit C (2017.05.01 TeleSign Responses to Twilio's First Set of RFPs) (No. 7 and 16).

Twilio reserves the right to amend and/or supplement these contentions based on any further information TeleSign produces relating to the competition between the parties, information relating to this factor otherwise obtained during discovery, and expert opinions relating to this factor. For example, records relating to head-to-head competition, market

BAKER BOTTS L.L.P.

analyses or studies, customer feedback, and any pricing discounts by either party to win work may be relevant to this analysis.

F.   ***Georgia-Pacific* Factor 6: "The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales"**

In general, convoyed sales involve sales of related products, which flow or would be expected to flow to the licensee from the right to manufacture, use, or sell the patented invention.  From an economic perspective, a license for a product that is expected to generate substantial "convoyed sales" is more valuable than a license that is not. This suggests that the reasonable royalty would be higher for a licensee that expects to generate such convoyed sales.

In addition to the Accused Products at issue in this case, TeleSign offers other products and services that Twilio does not allege are covered by the Asserted Patents.  For example, Twilio does not accuse TeleSign's Score and Phone ID products from infringing the Asserted Patents.  TeleSign's acquisition and retention of customers through the provision of the Accused Products may help TeleSign sell non-accused products such as Score and Phone ID.  TeleSign admits that there are significant synergies among its products.  For example, in co-pending litigation between the parties, TeleSign stated "the more customers TeleSign has, the more traffic it can process and analyze, which adds to the value and effectiveness of PhoneID."  Case No. 2:15-cv-03240-PSG-SS, Dkt. 21 (Aug. 5, 2015) at 14.  Further, TeleSign stated that it "cross-sells" its other products with its PhoneID product.  *Id.* at 15 ("TeleSign will lose sales of technology that it cross-sells with PhoneID. . .").  Twilio contends that TeleSign's sales of the Accused Products, and infringement of the Asserted Patents, enable TeleSign to sell more of its non-accused products such as Score and Phone ID.  All else being equal, this factor makes a license to the Asserted Patents more valuable.

Twilio contends that additional information concerning TeleSign's non-accused products may be relevant to this analysis.  For example, information concerning the operation, functionality, marketing, target customers, revenue, costs, profits, and usage metrics for non-

accused products from 2005 to present may be relevant to an analysis of the contribution of the patented technology of the Asserted Patents.  Per-unit financial information such as revenues, costs, and profits, on a line-item basis, for non-accused products from 2005 to present may be relevant to this analysis.  Further, business plans, marketing plans, and target customer plans or analyses for both the accused and non-accused products may be relevant to the analysis under this factor. TeleSign is in sole possession of information relating to its sales and marketing strategies and information relating to cross-selling of its products.

Further, TeleSign recently launched self-service access to its communications APIs.  *See* https://www.telesign.com/resources/press-releases/telesign-launches-self-service-access-communications-apis/.  Twilio contends that information relating to this new service, including marketing and promotion materials, information relating to any cross-selling or synergistic efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and profit information, and analyses concerning target market and target customers may be relevant to the analysis under this factor.

Twilio contends that the following documents may be relevant to the analysis under this factor:  TLS_00015671, TLS_00015673, TLS_00015720, TLS_00015734, TLS_00015746, TLS_00015793,    TLS_00015840,    TLS_00004627,    TLS_00008659,    TLS_00008665, TLS_00013055,    TLS_00014324,    TLS_00014954,    TLS_00015626,    TLS_00015627, TLS_00012799,    TLS_00012805,    TLS_00012871,    TLS_00012931,    TLS_00012993, TLS_00013489,    TLS_00013921,    TLS_00001354,    TLS_00001963,    TLS_00002018, TLS_00002114, TLS_00004540, TLS_00001117, TLS_00001127, TLS_0002140.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

**G.    *Georgia-Pacific Factor 7: "The duration of patent and the term of license"***

A license resulting from the hypothetical negotiation would have been for the unexpired term of the Patents-in-Suit.  The '021 Patent issued on November 6, 2012.  The '376 Patent issued June 17, 2014.  The '465 Patent issued September 16, 2014.  The damages period for

BAKER BOTTS L.L.P.

1   each patent begins no later than the issuance dates and extends through patent expiration.

2   Significant term remains on the Asserted Patents.

3       Twilio contends that information concerning TeleSign's incremental margins on the

4   Accused Products may be relevant to the analysis under this factor.   For example, Twilio

5   contends that TeleSign's incremental margins on the Accused Products increase with each

6   message that is sent.  Because significant life is remaining on the Asserted Patents, the parties to

7   the hypothetical negotiation would have known that TeleSign's incremental margins would have

8   increased through the life of the Asserted Patents.

9   **H.      *Georgia-Pacific Factor 8: "The established profitability of the product made
10          under the patent, its commercial success and its current popularity"***

11      Twilio is a leading cloud communications company founded in San Francisco by

12  software developers Jeff Lawson, Evan Cooke, and John Wolthuis. As software developers,

13  Twilio's founders experienced the difficulty of deeply integrating communications into software

14  applications that was caused by the complexity of tapping into the legacy world of telephony.

15  This difficulty in turn prevented rapid iteration and was a barrier to innovation. So, Jeff Lawson

16  and his co-founders built Twilio, a revolutionary telecommunications platform that software

17  developers can leverage to more quickly and easily integrate communications into their software

18  applications. This revolutionary design freed software developers from having to manage the

19  complex legacy telephony system and communications infrastructure so they can do what they

20  do best—iterate and innovate. Twilio's vision has been very successful. It went public in 2016,

21  has a market cap of over $1 Billion, and employs over 600 people. Twilio has been awarded

22  over 45 patents. Three of these patents are asserted in this suit. Each of the three asserted patents

23  solves a problem of bridging software developers and telephony communication.

24      A      sample      of     Twilio     customer      stories     are     available     at

25  https://customers.twilio.com/?_ga=2.42457325.919014724.1497628536-

26  180667087.1495751074.   Additional information about the success of Twilio's products is

27  available in Twilio's SEC filings.

28

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1　████████████████████████████████████████████████████

2　████████████████████████████████████████████　███████████

3　████████████████████████████████████████████████████████

4　██████████████████████████████████　However, TeleSign's production does not include

5　per-unit revenue, cost, or profitability data; nor does it include usage metrics such as number of

6　uses of each Accused Product per month.  Twilio contends that this information, for example,

7　may be relevant to the proper analysis of damages under this factor.

8　　Based on Twilo's initial investigation to date, TeleSign introduced REST APIs to

9　substitute its previous SOAP-based architecture in February 2012.  *See, e.g.,*

10　https://www.telesign.com/blog/post/restful-apis/.  TeleSign stated in a blog post as of that date

11　that "Today all of our customers access our APIs via SOAP and we've definitely heard that

12　folks want us to provide our APIs in an alternative form since almost all Web Services today use

13　REST."  Information concerning TeleSign's analysis of the switch from SOAP to REST, the

14　factors involved in that decision, any financial analyses or presentations concerning that

15　decision, any customer or developer feedback to TeleSign concerning the SOAP interface and

16　any requests to switch to REST or discussions concerning a potential switch may be relevant to

17　the analysis under this factor.  Further, any information concerning the impact of this switch on

18　TeleSign's usage metrics for the Accused Products, including number of message and number of

19　subscribers per month for each Accused Product before and after the transition, per unit revenue,

20　per unit cost and profitability data before and after the transition may be relevant to the analysis

21　under this factor.  Further, any customer / developer feedback concerning the switch may be

22　relevant to the analysis under this factor.  Further, any projections or forecasts concerning how

23　the switch from SOAP to REST would affect TeleSign, sales, costs, and profitability of the

24　Accused Products may be relevant to the analysis under this factor.

25　　REST provides several benefits over SOAP.  For example, SOAP was designed to

26　support a wide array of applications.  As such, its flexibility creates complexity, overhead, and

27　user unfriendliness in its design.  SOAP is also limited to the use of XML.  As a result, REST is

28

1  not as flexible as SOAP and is not appropriate for all applications.  However, when REST can

2  be used and is appropriate, it provides a number of benefits over SOAP.

3        Further, REST provides its own form of flexibility.  For example, while SOAP is based

4  on a number of standards and is a protocol requiring strict adherence in order to avoid errors,

5  REST is more of an architecture that provides flexibility in how the API is designed.  REST

6  requests can be encoded in URIs that are sent to servers as stateless requests--similar to how

7  HTTP requests are made.

8        SOAP requests are not encoded into the URI but must be delivered as objects in the body

9  of a request.  As long as the request can be made into a URI and kept stateless, REST can be

10  used to avoid the complexity of specifying a SOAP object format.

11        TeleSign recognized the benefits of REST over SOAP.  For example, TeleSign identified

12  in February 2012 that:

13

14        There are a few advantages to this method: (1) The secret information is
         never passed between each party during the transaction; (2) Because each

15        party has a copy of the secret key, the sender and recipient are
         independently able to create the "Authorization" token. As long as the

16        token is created in the same way on each side the authorization of the
         transaction will succeed; (3) Because the authorization token contains a

17        hash of not only the API Key but the transaction as well, the recipient can
         be assured that both the transaction is properly authenticated and that it

18        hasn't been modified in transit.

19  See https://www.telesign.com/blog/post/restful-apis/.

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  █████████████████████████████████████████████

24        Further, TeleSign recently launched a new self-service access to its communications

25  APIs.  The self-service feature is marketed by TeleSign as being user-friendly and not complex.

26  The user-friendliness and lack of complexity is enabled by the REST architecture.

27

28

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1   Twilio contends the following documents may be relevant to the analysis under this

2   factor:  TLS_00008665, TLS_00015598, TLS_00004627, TLS_00008659, TLS_00008665,

3   TLS_00013055,      TLS_00014324,      TLS_00014954,      TLS_00015626,      TLS_00015627,

4   TLS_00012799,      TLS_00012805,      TLS_00012871,      TLS_00012931,      TLS_00012993,

5   TLS_00013489, TLS_00013921, TLS_0002141.

6   Twilio contends that monthly or quarterly unit price, unit sales, revenue, and unit cost

7   information (including detailed line items of what comprises unit costs) per customer from 2005

8   to present for each Accused Product may be relevant to the analysis under this factor.  To the

9   extent that any Accused Products were modified and/or updated over time, Twilio contends the

10  same information for predecessor products may be relevant to this analysis as well.  Further,

11  monthly or quarterly profitability (e.g., revenue; costs of goods sold (COGS); selling, general,

12  and administrative expenses (SG&A); and research and development expenses (R&D), etc.) and

13  other financial information related to each Accused Product and its predecessors from 2005 to

14  present may be relevant to this analysis.  Further, Twilio contends that information concerning

15  TeleSign's incremental margins on the Accused Products may be relevant to the analysis under

16  this factor.  For example, Twilio contends that TeleSign's incremental margins on the Accused

17  Products increase with each message that is sent.  Further, technical specifications and features

18  for each Accused Product and any predecessor may be relevant to this analysis.

19  For example, TeleSign produced limited information relating to revenues, costs, and

20  profitability of the Accused Products at TLS_00008665.    However, this information is

21  incomplete at least because it does not include any data earlier than January 2012.  TeleSign

22  switched from a SOAP architecture to a REST architecture for the Accused Products on or

23  around February 2012.  Thus, financial information that pre-dates this switch would enable

24  Twilio to analyze how the change in technology affected TeleSign's financials.  Further, the

25  revenue, cost, and profit data is not broken down by line item or broken down on a per-unit

26  basis.  For example, Twilio contends that per-unit costs and per-unit revenues may be relevant to

27  the analysis under this factor.

28

BAKER BOTTS L.L.P.

Further, Twilio contends that information concerning quantities of each Accused Product sold by TeleSign over time may be relevant to this analysis. For example, the number of messages sent per month for each Accused Product and the number of subscribers per month for each Accused Product may be relevant to this analysis. Twilio has not located such information in TeleSign's document production, and such information is solely in the possession of TeleSign.

Further, TeleSign recently launched self-service access to its communications APIs. *See* https://www.telesign.com/resources/press-releases/telesign-launches-self-service-access-communications-apis/. Twilio contends that information relating to this new service, including marketing and promotion materials, information relating to any cross-selling or synergistic efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and profit information, projected and actual quantities sold (e.g., number of messages per month), and analyses concerning target market and target customers may be relevant to the analysis under this factor.

Twilio contends that additional information concerning TeleSign's non-accused products may be relevant to this analysis. For example, information concerning the operation, functionality, marketing, target customers, revenue, costs, profits, and usage metrics for non-accused products from 2005 to present may be relevant to an analysis of the contribution of the patented technology of the Asserted Patents. Per-unit financial information such as revenues, costs, and profits, on a line-item basis, for non-accused products from 2005 to present may be relevant to this analysis. Further, business plans, marketing plans, and target customer plans or analyses for both the accused and non-accused products may be relevant to the analysis under this factor.

Based on Twilio's initial investigation to date, it appears that TeleSign has a number of partnerships with third parties, including Comodo; ██ Deepnet Security; ████ RSA; ██ Mobile Mentor; ████ ████ BahavioSec; and Orange. Twilio is not in possession of further information regarding these partnerships, including any licensing or technology transfer / sharing agreements that may have been executed, services / products

1   received or provided, and any related financial provisions.  This information may affect the
2   analysis of a reasonable royalty under this factor.

3        Further, documents relating to Twilio's own profitability and pricing relating to its
4   products that practice the claims may be relevant under this analysis.  Those documents will be
5   forthcoming according to the discovery schedule.  In particular, because TeleSign took a lengthy
6   extension on written discovery, Twilio too has an extension and its financial production has not
7   become due yet.  Twilio is in the process of searching its relevant financials and its related
8   document production will be forthcoming.

9        Twilio reserves its right to amend and supplement these contentions based on any
10  information obtained during discovery and expert opinions relating to this factor.

11  **I.**     ***Georgia-Pacific Factor 9: "The utility and advantages of patent property over***
12          ***old modes and devices, if any, that had been used for working out similar***
          ***results"***

13
14  **J.**     ***Georgia-Pacific Factor 10: "The nature of the patented invention; the***
          ***character of the commercial embodiment of it as owned and produced by the***
15          ***licensor; and the benefit of those who have used the invention"***

16       *Georgia-Pacific* Factor Nos. 9 and 10 are often considered together because of their
17  similar nature. *Georgia-Pacific* Factor Nos. 9 and 10 both relate to the advantages conveyed due
18  to the use of the patented invention and the related benefits enjoyed by the user of the patented
19  invention over alternative means of achieving similar results.

20       The Asserted Patents address a specific problem relating to bridging software developers
21  and telephony communication.  D.I. 1-1 at 1:30-59.  In the shared specification, the inventors
22  explain that the problem arises because of the modern combination of apps with the often older,
23  complex telephony network systems.  D.I 1-4 at 39-46.  While developments like VoIP and
24  commodity hardware make it possible at a high-level to create programs that work with
25  telephony networks, the old telephony environment presents significant problems.  *Id.* at 30-34.
26  As explained by the inventors, developing even the simplest app to work with complicated
27  telephony network components and protocols requires developers to customize their apps to
28  work with voice networking codecs, to use specialty hardware and software to bridge the

BAKER BOTTS L.L.P.

application server to the telephony network components. *Id*. at 33-46.  The app developers also need to learn and implement the languages specific to the particular networks the app would need to connect to. *Id*.  According to the inventors, the problems are compounded if the app developer wants the ability to connect to and work with multiple, disparate networks. The inventors of the Asserted Patents sought to provide solutions to the problem by bridging the gap between the developer and the legacy world of telephony communications. *Id*. at 1:30-59.

One solution to the problems presented as a result of the intersection of app technology and telephony networks is recited in claim 13 of the '021 Patent.  Claim 13 of the '021 Patent is directed to a specific improvement of the interaction between application servers and telephony network components without the need for custom app programming and hardware necessary for communication between each telephony and the app server.  More specifically, claim 13 recites a particular combination of elements to link app servers to telephony sessions on the telephony network. D.I. 1-1 at cl. 13.  The claimed method uses a Uniform Resource Identifier (URI) in a specific way to link the telephony session with the app server and to access telephony network functionality ("creating call router resources…, wherein the call router resources are accessible by outside devices at an addressable Uniform Resource Identifier (URI)," "mapping a telephony session to the URI, the URI being associated with the application server"). *Id*.  The claimed Application Programming Interface facilitates communication between the app server and telephony network components communication ("creating call router resources accessible through a call router Application Programming Interface (API)," "receiving an API request from the application server for interaction with a resource"). *Id*.  The state information embedded in the request to an app server provides the information needed to allow the app server to process and understand the original telephony request ("embedding state information of the telephony session in the request," "receiving from the application server a response comprising telephony instructions for sequential processing").  D.I. 1-1 at 4:31-5:46, cl. 1 ("embedding state information of the telephony session in the request").  The claimed use of embedded state information, URI, and API is a unique combination of steps that makes it possible to bridge the

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1  gap between app server technology and telephony technology without the need for custom

2  systems and interfaces—the problem identified in the specification. *Id*. at 1:30-59.

3     Based on Twilio's initial investigation to date, TeleSign introduced REST APIs to

4  substitute its previous SOAP-based architecture in February 2012. *See, e.g.,*

5  https://www.telesign.com/blog/post/restful-apis/.  TeleSign stated in a blog post as of that date

6  that "Today all of our customers access our APIs via SOAP and we've definitely heard that

7  folks want us to provide our APIs in an alternative form since almost all Web Services today use

8  REST."  Information concerning TeleSign's analysis of the switch from SOAP to REST, the

9  factors involved in that decision, any financial analyses or presentations concerning that

10 decision, any customer or developer feedback to TeleSign concerning the SOAP interface and

11 any requests to switch to REST or discussions concerning a potential switch may be relevant to

12 the analysis under this factor.  Further, any information concerning the impact of this switch on

13 TeleSign's usage metrics for the Accused Products, including number of message and number of

14 subscribers per month for each Accused Product before and after the transition, per unit revenue,

15 per unit cost and profitability data before and after the transition may be relevant to the analysis

16 under this factor.  Further, any customer / developer feedback concerning the switch may be

17 relevant to the analysis under this factor.  Further, any projections or forecasts concerning how

18 the switch from SOAP to REST would affect TeleSign, sales, costs, and profitability of the

19 Accused Products may be relevant to the analysis under this factor.

20    REST provides several benefits over SOAP.  For example, SOAP was designed to

21 support a wide array of applications.  As such, its flexibility creates complexity, overhead, and

22 user unfriendliness in its design.  SOAP is also limited to the use of XML.  As a result, REST is

23 not as flexible as SOAP and is not appropriate for all applications.  However, when REST can

24 be used and is appropriate, it provides a number of benefits over SOAP.

25    Further, REST provides its own form of flexibility.  For example, while SOAP is based

26 on a number of standards and is a protocol requiring strict adherence in order to avoid errors,

27 REST is more of an architecture that provides flexibility in how the API is designed.  REST

28

requests can be encoded in URIs that are sent to servers as stateless requests--similar to how HTTP requests are made.

SOAP requests are not encoded into the URI but must be delivered as objects in the body of a request. As long as the request can be made into a URI and kept stateless, REST can be used to avoid the complexity of specifying a SOAP object format.

TeleSign recognized the benefits of REST over SOAP. For example, TeleSign identified in February 2012 that:

> There are a few advantages to this method: (1) The secret information is never passed between each party during the transaction; (2) Because each party has a copy of the secret key, the sender and recipient are independently able to create the "Authorization" token. As long as the token is created in the same way on each side the authorization of the transaction will succeed; (3) Because the authorization token contains a hash of not only the API Key but the transaction as well, the recipient can be assured that both the transaction is properly authenticated and that it hasn't been modified in transit.

*See* https://www.telesign.com/blog/post/restful-apis/.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

Further, TeleSign recently launched a new self-service access to its communications APIs. https://www.telesign.com/resources/press-releases/telesign-launches-self-service-access-communications-apis/. The self-service feature is marketed by TeleSign as being user-friendly and not complex. The user-friendliness and lack of complexity is enabled by the REST architecture. Twilio contends that information relating to this new service, including marketing and promotion materials, information relating to any cross-selling or synergistic efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and profit information, projected and actual quantities sold (e.g., number of messages per month), and

BAKER BOTTS L.L.P.

analyses concerning target market and target customers may be relevant to the analysis under this factor.

Twilio is currently unaware of any acceptable, non-infringing alternatives or a design-around available to TeleSign which would provide the same or similar benefits of subject matter claimed in the Asserted Patents. Should TeleSign put forth a damages analysis in this case that relies on or refers to any specific non-infringing alternatives or a design-around, Twilio intends to review such information and reserves the right to supplement these contentions.

Twilio contends that monthly or quarterly unit price, unit sales, revenue, and unit cost information (including detailed line items of what comprises unit costs) per customer from 2005 to present for each Accused Product may be relevant to the analysis under this factor. To the extent that any Accused Products were modified and/or updated over time, Twilio contends the same information for predecessor products may be relevant to this analysis as well. Further, monthly or quarterly profitability (e.g., revenue; costs of goods sold (COGS); selling, general, and administrative expenses (SG&A); and research and development expenses (R&D), etc.) and other financial information related to each Accused Product and its predecessors from 2005 to present may be relevant to this analysis. Further, Twilio contends that information concerning TeleSign's incremental margins on the Accused Products may be relevant to the analysis under this factor. For example, Twilio contends that TeleSign's incremental margins on the Accused Products increase with each message that is sent. Further, technical specifications and features for each Accused Product and any predecessor may be relevant to this analysis.

For example, TeleSign produced limited information relating to revenues, costs, and profitability of the Accused Products at TLS_00008665. However, this information is incomplete at least because it does not include any data earlier than January 2012. Twilio contends that TeleSign switched from a SOAP architecture to a REST architecture for the Accused Products on or around February 2012. Thus, financial information that pre-dates this switch would enable Twilio to analyze how the change in technology affected TeleSign's financials. Further, the revenue, cost, and profit data is not broken down by line item or broken

1   down on a per-unit basis.   For example, Twilio contends that per-unit costs and per-unit

2   revenues may be relevant to the analysis under this factor.

3          Further, Twilio contends that information concerning quantities of each Accused Product

4   sold by TeleSign over time may be relevant to this analysis.   For example, the number of

5   messages sent per month for each Accused Product and the number of subscribers per month for

6   each Accused Product may be relevant to this analysis.   Twilio has not located such information

7   in TeleSign's document production, and such information is solely in the possession of

8   TeleSign.

9          Based on Twilio's initial investigation to date, it appears that TeleSign has a number of

10  partnerships with third parties, including Comodo; ███ Deepnet Security; ███████; RSA;

11  ███ Mobile Mentor; ████████ ████████ BahavioSec; and Orange.   Twilio is not in

12  possession of further information regarding these partnerships, including any licensing or

13  technology transfer / sharing agreements that may have been executed, services / products

14  received or provided, and any related financial provisions.   This information may affect the

15  analysis of a reasonable royalty under this factor.

16         Twilio contends that additional information concerning TeleSign's non-accused products

17  may be relevant to this analysis.   For example, information concerning the operation,

18  functionality, marketing, target customers, revenue, costs, profits, and usage metrics for non-

19  accused products from 2005 to present may be relevant to an analysis of the contribution of the

20  patented technology of the Asserted Patents.   Per-unit financial information from 2005 to

21  present such as revenues, costs, and profits, on a line-item basis, for non-accused products may

22  be relevant to this analysis.   Further, business plans, marketing plans, and target customer plans

23  or analyses for both the accused and non-accused products may be relevant to the analysis under

24  this factor. TeleSign is in sole possession of information relating to its sales and marketing

25  strategies and information relating to cross-selling of its products.

26         Further, documents relating to Twilio's own profitability and pricing relating to its

27  products that practice the claims may be relevant under this analysis.   Those documents will be

28  forthcoming according to the discovery schedule.   In particular, because TeleSign took a lengthy

BAKER BOTTS L.L.P.

extension on written discovery, Twilio too has an extension and its financial production has not become due yet.  Twilio is in the process of searching its relevant financials and its related document production will be forthcoming.

Twilio contends the following documents may be relevant to the analysis under this factor:  TLS_00020785, TLS_00020895, TLS_00002108, TLS_00005587, TLS_00005588, TLS_00000927,     TLS_00008508,     TLS_00008511,     TLS_00008516,     TLS_00013138, TLS_00013143,     TLS_00013377,     TLS_00015243,     TLS_00015311,     TLS_00015316, TLS_00015323,     TLS_00015326,     TLS_00015366,     TLS_00015375,     TLS_00015380, TLS_00018193,     TLS_00002018,     TLS_00002106,     TLS_00005288,     TLS_00005542, TLS_00005552,     TLS_00005555,     TLS_00005561,     TLS_00005565,     TLS_00005576, TLS_00005589,     TLS_00008681,     TLS_00009119,     TLS_00013143,     TLS_00015243, TLS_00015344,     TLS_00015588,     TLS_00015607,     TLS_00015616,     TLS_00015623, TLS_00018193,     TLS_00020567,     TLS_00004350,     TLS_00004464,     TLS_00004465, TLS_00004469,     TLS_00004477,     TLS_00004499,     TLS_00004503,     TLS_00004507, TLS_00004512,     TLS_00004513,     TLS_00004523,     TLS_00004527,     TLS_00004529, TLS_00004540,     TLS_00012760,     TLS_00012766,     TLS_00014955,     TLS_00015034, TLS_00015050,     TLS_00004253,     TLS_00004266,     TLS_00004583,     TLS_00004608, TLS_00008690,     TLS_00008695,     TLS_00008697,     TLS_00008699,     TLS_00008704, TLS_00008740,     TLS_00015126,     TLS_00015133,     TLS_00015202,     TLS_00004627, TLS_00008659,     TLS_00008665,     TLS_00013055,     TLS_00014324,     TLS_00014954, TLS_00015626,     TLS_00015627,     TLS_00015598,     TLS_00012799,     TLS_00012805, TLS_00012871,     TLS_00012931,     TLS_00012993,     TLS_00013489,     TLS_00013921, TLS_0002141,     TLS_00000871,     TLS_00000915,     TLS_00000917,     TLS_00001080, TLS_00001084, TLS_00001086, TLS_00001112.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

**K.** ***Georgia-Pacific Factor 11: "The extent to which the infringer has made use of the invention; and any evidence probative of the value of such use"***

The extent of use of the patented inventions is relevant to this analysis. For example, a an invention with more frequent use would command a higher royalty, all else equal, than an invention with less frequent use. Based on information currently known to Twilio, TeleSign made and makes significant use of the patented inventions. However, Twilio has not been able to locate in TeleSign's productions information concerning the extent of use or quantities sold of the Accused Products. For example, usage metrics including the number of uses of each Accused Product on a monthly basis (i.e., number of messages sent per month) may be relevant to this analysis. Further, information concerning the number of subscribers for each Accused Product, on a monthly basis, may be relevant to this analysis. Further, Twilio contends that information concerning TeleSign's incremental margins on the Accused Products may be relevant to the analysis under this factor. For example, Twilio contends that TeleSign's incremental margins on the Accused Products increase with each message that is sent. Such information is solely within the possession of TeleSign.

However, TeleSign's production does not include per-unit revenue, cost, or profitability data; nor does it include usage metrics such as number of uses of each Accused Product per month. Twilio contends that this information, for example, may be relevant to the proper analysis of damages under this factor.

Twilio contends that monthly or quarterly unit price, unit sales, revenue, and unit cost information (including detailed line items of what comprises unit costs) per customer from 2005 to present for each Accused Product may be relevant to the analysis under this factor. To the extent that any Accused Products were modified and/or updated over time, Twilio contends the same information for predecessor products may be relevant to this analysis as well. Further, monthly or quarterly profitability (e.g., revenue; costs of goods sold (COGS); selling, general,

BAKER BOTTS L.L.P.

1  and administrative expenses (SG&A); and research and development expenses (R&D), etc.) and

2  other financial information related to each Accused Product and its predecessors from 2005 to

3  present may be relevant to this analysis.  Further, technical specifications and features for each

4  Accused Product and any predecessor may be relevant to this analysis.

5       For example, TeleSign produced limited information relating to revenues, costs, and

6  profitability of the Accused Products at TLS_00008665.   However, this information is

7  incomplete at least because it does not include any data earlier than January 2012.  TeleSign

8  switched from a SOAP architecture to a REST architecture for the Accused Products on or

9  around February 2012.  Thus, financial information that pre-dates this switch would enable

10  Twilio to analyze how the change in technology affected TeleSign's financials.  Further, the

11  revenue, cost, and profit data is not broken down by line item or broken down on a per-unit

12  basis.  For example, Twilio contends that per-unit costs and per-unit revenues may be relevant to

13  the analysis under this factor.



19  TLS_00012993.   Information, data, and

20  presentations made to the third-party financial advisors who performed such valuations may be

21  relevant to the analysis under this factor.

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ███████████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ███████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ██████████████████████████████

10     Further, BICS announced its purchase of TeleSign Corporation in April 25, 2017 for

11 $230 million.  Information concerning this transaction may be relevant to the analysis under this

12 factor.  For example, any materials or information shared with investors or potential buyers,

13 including but not limited to BICS, may be relevant to this analysis.  Further, any materials and

14 data regarding the valuation of TeleSign, including materials and data regarding the valuation of

15 TeleSign's intellectual property and valuation of the Accused and non-accused Products may be

16 relevant to this analysis.  This includes any opinion on fair value provided by third-party

17 financial advisors.  Further, information regarding which assets, including any IP, that was

18 transferred from TeleSign to BICS may be relevant to the analysis under this factor.  Further,

19 materials concerning the objective of the acquisition for both parties and any potential parties

20 may be relevant to the analysis under this factor.  Further, any analyst reports relating to this

21 acquisition may be relevant to this analysis.  Information relating to TeleSign's due diligence in

22 connection with this transaction may also be relevant to the analysis under this factor.  Twilio

23 requested "all documents relating to You attempting to sell TeleSign or otherwise seeking a

24 merger, acquisition or partnership" in RFP No. 15.  *See* Exhibit C.  Based on information

25 currently available to Twilio, on a May 5, 2017 earnings call, the CEO of BICS stated "TeleSign

26 is a market leader in what is called 2factor authentication, which is digital platform user

27 authentication by SMS.  And 20 out of the top 25 Internet companies are customers of TeleSign

28 to improve the security of their user accounts.  So as such, TeleSign generates billions of SMS to

BAKER BOTTS L.L.P.

1  all mobile network operators around the world, while we are physically connected to all these

2  operators to which we are providing voice messaging and roaming services."

3       Based on Twilio's initial investigation to date, it appears that TeleSign has a number of

4  partnerships with third parties, including Comodo; ███ Deepnet Security; ███████ RSA;

5  ███ Mobile Mentor; ███████ ███████ BahavioSec; and Orange.  Twilio is not in

6  possession of further information regarding these partnerships, including any licensing or

7  technology transfer / sharing agreements that may have been executed, services / products

8  received or provided, and any related financial provisions.  This information may affect the

9  analysis of a reasonable royalty under this factor.

10      Further, TeleSign recently launched self-service access to its communications APIs.  *See*

11 https://www.telesign.com/resources/press-releases/telesign-launches-self-service-access-

12 communications-apis/.  Twilio contends that information relating to this new service, including

13 marketing and promotion materials, information relating to any cross-selling or synergistic

14 efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and

15 profit information, projected and actual quantities sold (e.g., number of messages per month),

16 and analyses concerning target market and target customers may be relevant to the analysis

17 under this factor.

18      Twilio contends that additional information concerning TeleSign's non-accused products

19 may be relevant to this analysis.  For example, information concerning the operation,

20 functionality, marketing, target customers, revenue, costs, profits, and usage metrics for non-

21 accused products from 2005 to present may be relevant to an analysis of the contribution of the

22 patented technology of the Asserted Patents.  Per-unit financial information from 2005 to

23 present such as revenues, costs, and profits, on a line-item basis, for non-accused products may

24 be relevant to this analysis.  Further, business plans, marketing plans, and target customer plans

25 or analyses for both the accused and non-accused products may be relevant to the analysis under

26 this factor. TeleSign is in sole possession of information relating to its sales and marketing

27 strategies and information relating to cross-selling of its products.

28

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

Based on Twilo's initial investigation to date, TeleSign introduced REST APIs to substitute its previous SOAP-based architecture in February 2012. *See, e.g.,* https://www.telesign.com/blog/post/restful-apis/. TeleSign stated in a blog post as of that date that "Today all of our customers access our APIs via SOAP and we've definitely heard that folks want us to provide our APIs in an alternative form since almost all Web Services today use REST." Information concerning TeleSign's analysis of the switch from SOAP to REST, the factors involved in that decision, any financial analyses or presentations concerning that decision, any customer or developer feedback to TeleSign concerning the SOAP interface and any requests to switch to REST or discussions concerning a potential switch may be relevant to the analysis under this factor. Further, any information concerning the impact of this switch on TeleSign's usage metrics for the Accused Products, including number of message and number of subscribers per month for each Accused Product before and after the transition, per unit revenue, per unit cost and profitability data before and after the transition may be relevant to the analysis under this factor. Further, any customer / developer feedback concerning the switch may be relevant to the analysis under this factor. Further, any projections or forecasts concerning how the switch from SOAP to REST would affect TeleSign, sales, costs, and profitability of the Accused Products may be relevant to the analysis under this factor.

REST provides several benefits over SOAP. For example, SOAP was designed to support a wide array of applications. As such, its flexibility creates complexity, overhead, and user unfriendliness in its design. SOAP is also limited to the use of XML. As a result, REST is not as flexible as SOAP and is not appropriate for all applications. However, when REST can be used and is appropriate, it provides a number of benefits over SOAP.

Further, REST provides its own form of flexibility. For example, while SOAP is based on a number of standards and is a protocol requiring strict adherence in order to avoid errors, REST is more of an architecture that provides flexibility in how the API is designed. REST requests can be encoded in URIs that are sent to servers as stateless requests--similar to how HTTP requests are made.

BAKER BOTTS L.L.P.

1  SOAP requests are not encoded into the URI but must be delivered as objects in the body

2  of a request.  As long as the request can be made into a URI and kept stateless, REST can be

3  used to avoid the complexity of specifying a SOAP object format.

4  TeleSign recognized the benefits of REST over SOAP.  For example, TeleSign identified

5  in February 2012 that:

6

7  > There are a few advantages to this method: (1) The secret information is
   > never passed between each party during the transaction; (2) Because each
   > party has a copy of the secret key, the sender and recipient are

8  > independently able to create the "Authorization" token. As long as the
   > token is created in the same way on each side the authorization of the

9  > transaction will succeed; (3) Because the authorization token contains a
   > hash of not only the API Key but the transaction as well, the recipient can

10 > be assured that both the transaction is properly authenticated and that it
   > hasn't been modified in transit.

11

12 *See* https://www.telesign.com/blog/post/restful-apis/.

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ██████████████████████████████   *Id.* at 9328.

17  Further, TeleSign recently launched a new self-service access to its communications

18  APIs.  The self-service feature is marketed by TeleSign as being user-friendly and not complex.

19  The user-friendliness and lack of complexity is enabled by the REST architecture.

20  Twilio contends the following documents may be relevant to the analysis under this

21  factor: TLS_00004627, TLS_00008659, TLS_00008665, TLS_00013055, TLS_00014324,

22  TLS_00014954,   TLS_00015626,   TLS_00015627,   TLS_00015598,   TLS_00012799,

23  TLS_00012805,   TLS_00012871,   TLS_00012931,   TLS_00012993,   TLS_00013489,

24  TLS_00013921, TLS_0002141.

25  Twilio reserves its right to amend and supplement these contentions based on any

26  information obtained during discovery and expert opinions relating to this factor.

27

28

BAKER BOTTS L.L.P.

**L.**    ***Georgia-Pacific Factor 12: "The portion of profit or of the selling price customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions"***

Based on the information Twilio currently possesses, Twilio is unaware of any customary apportionment of profit in this industry.  However, discovery is in the early stages, and information regarding a customary apportionment of profit may be acquired during discovery.  For example, third party license agreements, industry surveys / studies, and related information may be available during discovery.  Further, TeleSign may produce license or technology sharing / transfer agreements during discovery that relate to the relevant industry to the Asserted Patents.  This information may be instructive as to the various forms or structures of royalty payments that have been utilized in the industry relevant to the Asserted Patents as well as any apportionment of profit that may be customary in the industry.

Twilio contends that monthly or quarterly unit price, unit sales, revenue, and unit cost information (including detailed line items of what comprises unit costs) per customer from 2005 to present for each Accused Product may be relevant to the analysis under this factor.  To the extent that any Accused Products were modified and/or updated over time, Twilio contends the same information for predecessor products may be relevant to this analysis as well.  Further, monthly or quarterly profitability (e.g., revenue; costs of goods sold (COGS); selling, general, and administrative expenses (SG&A); and research and development expenses (R&D), etc.) and other financial information related to each Accused Product and its predecessors from 2005 to present may be relevant to this analysis.  Further, Twilio contends that information concerning TeleSign's incremental margins on the Accused Products may be relevant to the analysis under this factor.  For example, Twilio contends that TeleSign's incremental margins on the Accused Products increase with each message that is sent.  Further, technical specifications and features for each Accused Product and any predecessor may be relevant to this analysis.

For example, TeleSign produced limited information relating to revenues, costs, and profitability of the Accused Products at TLS_00008665.  However, this information is incomplete at least because it does not include any data earlier than January 2012.  Twilio contends that TeleSign switched from a SOAP architecture to a REST architecture for the

1   Accused Products on or around February 2012.  Thus, financial information that pre-dates this

2   switch would enable Twilio to analyze how the change in technology affected TeleSign's

3   financials.  Further, the revenue, cost, and profit data is not broken down by line item or broken

4   down on a per-unit basis.  For example, Twilio contends that per-unit costs and per-unit

5   revenues may be relevant to the analysis under this factor.

6        Further, Twilio contends that information concerning quantities of each Accused Product

7   sold by TeleSign over time may be relevant to this analysis.  For example, the number of

8   messages sent per month for each Accused Product and the number of subscribers per month for

9   each Accused Product may be relevant to this analysis.  Twilio has not located such information

10  in TeleSign's document production, and such information is solely in the possession of

11  TeleSign.

12       Further, TeleSign recently launched self-service access to its communications APIs.  *See*

13  https://www.telesign.com/resources/press-releases/telesign-launches-self-service-access-

14  communications-apis/.  Twilio contends that information relating to this new service, including

15  marketing and promotion materials, information relating to any cross-selling or synergistic

16  efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and

17  profit information, projected and actual quantities sold (e.g., number of messages per month),

18  and analyses concerning target market and target customers may be relevant to the analysis

19  under this factor.

20       Twilio contends that additional information concerning TeleSign's non-accused products

21  may be relevant to this analysis.  For example, information concerning the operation,

22  functionality, marketing, target customers, revenue, costs, profits, and usage metrics for non-

23  accused products from 2005 to present may be relevant to an analysis of the contribution of the

24  patented technology of the Asserted Patents.  Per-unit financial information such as revenues,

25  costs, and profits, on a line-item basis, from 2005 to present for non-accused products may be

26  relevant to this analysis.  Further, business plans, marketing plans, and target customer plans or

27  analyses for both the accused and non-accused products may be relevant to the analysis under

28

BAKER BOTTS L.L.P.

this factor. TeleSign is in sole possession of information relating to its sales and marketing strategies and information relating to cross-selling of its products.

Based on Twilio's initial investigation to date, it appears that TeleSign has a number of partnerships with third parties, including Comodo; ███ Deepnet Security; ███████RSA; ███ Mobile Mentor; ████████ ████████; BahavioSec; and Orange.  Twilio is not in possession of further information regarding these partnerships, including any licensing or technology transfer / sharing agreements that may have been executed, services / products received or provided, and any related financial provisions.  This information may affect the analysis of a reasonable royalty under this factor.

Further, documents relating to Twilio's own profitability and pricing relating to its products that practice the claims may be relevant under this analysis.  Those documents will be forthcoming according to the discovery schedule.  In particular, because TeleSign took a lengthy extension on written discovery, Twilio too has an extension and its financial production has not become due yet.  Twilio is in the process of searching its relevant financials and its related document production will be forthcoming.

Twilio contends the following documents may be relevant to the analysis under this factor:  TLS_00015598,  TLS_00020785,  TLS_00020895,  TLS_00002108,  TLS_00005587, TLS_00005588,  TLS_00000927,  TLS_00008508,  TLS_00008511,  TLS_00008516, TLS_00013138,  TLS_00013143,  TLS_00013377,  TLS_00015243,  TLS_00015311, TLS_00015316,  TLS_00015323,  TLS_00015326,  TLS_00015366,  TLS_00015375, TLS_00015380,  TLS_00018193,  TLS_00002018,  TLS_00002106,  TLS_00005288, TLS_00005542,  TLS_00005552,  TLS_00005555,  TLS_00005561,  TLS_00005565, TLS_00005576,  TLS_00005589,  TLS_00008681,  TLS_00009119,  TLS_00013143, TLS_00015243,  TLS_00015344,  TLS_00015588,  TLS_00015607,  TLS_00015616, TLS_00015623,  TLS_00018193,  TLS_00020567,  TLS_00004350,  TLS_00004464, TLS_00004465,  TLS_00004469,  TLS_00004477,  TLS_00004499,  TLS_00004503, TLS_00004507,  TLS_00004512,  TLS_00004513,  TLS_00004523,  TLS_00004527, TLS_00004529,  TLS_00004540,  TLS_00012760,  TLS_00012766,  TLS_00014955,

BAKER BOTTS L.L.P.

TLS_00015034,    TLS_00015050,    TLS_00004253,    TLS_00004266,    TLS_00004583,

TLS_00004608,    TLS_00008690,    TLS_00008695,    TLS_00008697,    TLS_00008699,

TLS_00008704,    TLS_00008740,    TLS_00015126,    TLS_00015133,    TLS_00015202,

TLS_00004627,    TLS_00008659,    TLS_00008665,    TLS_00013055,    TLS_00014324,

TLS_00014954,    TLS_00015626,    TLS_00015627,    TLS_00015598,    TLS_00012799,

TLS_00012805,    TLS_00012871,    TLS_00012931,    TLS_00012993,    TLS_00013489,

TLS_00013921, TLS_0002141.

Twilio reserves its right to amend and supplement these contentions based on any information obtained during discovery and expert opinions relating to this factor.

**M.** ***Georgia-Pacific Factor 13: "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer"***

TeleSign is in possession of information relating to any non-patented elements of the Accused Products, the manufacturing process, business risks, or significant features or improvements added by TeleSign to the Accused Products. This information may be relevant to Twilio's analysis of an appropriate reasonable royalty under this factor.

Twilio is currently unaware of any acceptable, non-infringing alternatives or a design-around available to TeleSign which would provide the same or similar benefits of subject matter claimed in the Asserted Patents. Should TeleSign put forth a damages analysis in this case that relies on or refers to any specific non-infringing alternatives or a design-around, Twilio intends to review such information and reserves the right to supplement these contentions.

Twilio contends that monthly or quarterly unit price, unit sales, revenue, and unit cost information (including detailed line items of what comprises unit costs) per customer from 2005 to present for each Accused Product may be relevant to the analysis under this factor. To the extent that any Accused Products were modified and/or updated over time, Twilio contends the same information for predecessor products may be relevant to this analysis as well. Further, monthly or quarterly profitability (e.g., revenue; costs of goods sold (COGS); selling, general,

1   and administrative expenses (SG&A); and research and development expenses (R&D), etc.) and

2   other financial information related to each Accused Product and its predecessors from 2005 to

3   present may be relevant to this analysis.  Further, Twilio contends that information concerning

4   TeleSign's incremental margins on the Accused Products may be relevant to the analysis under

5   this factor.  For example, Twilio contends that TeleSign's incremental margins on the Accused

6   Products increase with each message that is sent.  Further, technical specifications and features

7   for each Accused Product and any predecessor may be relevant to this analysis.

8           For example, TeleSign produced limited information relating to revenues, costs, and

9   profitability of the Accused Products at TLS_00008665.   However, this information is

10  incomplete at least because it does not include any data earlier than January 2012.  Twilio

11  contends that TeleSign switched from a SOAP architecture to a REST architecture for the

12  Accused Products on or around February 2012.  Thus, financial information that pre-dates this

13  switch would enable Twilio to analyze how the change in technology affected TeleSign's

14  financials.  Further, the revenue, cost, and profit data is not broken down by line item or broken

15  down on a per-unit basis.  For example, Twilio contends that per-unit costs, per-unit revenues,

16  and per-unit profits may be relevant to the analysis under this factor.

17          Further, Twilio contends that information concerning quantities of each Accused Product

18  sold by TeleSign over time may be relevant to this analysis.  For example, the number of

19  messages sent per month for each Accused Product and the number of subscribers per month for

20  each Accused Product may be relevant to this analysis.  Twilio has not located such information

21  in TeleSign's document production, and such information is solely in the possession of

22  TeleSign.

23          Further, TeleSign recently launched self-service access to its communications APIs.  *See*

24  https://www.telesign.com/resources/press-releases/telesign-launches-self-service-access-

25  communications-apis/.  Twilio contends that information relating to this new service, including

26  marketing and promotion materials, information relating to any cross-selling or synergistic

27  efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and

28  profit information, projected and actual quantities sold (e.g., number of messages per month),

BAKER BOTTS L.L.P.

and analyses concerning target market and target customers may be relevant to the analysis under this factor.

Based on Twilio's initial investigation to date, it appears that TeleSign has a number of partnerships with third parties, including Comodo; ████ Deepnet Security; ████████ RSA; ████ Mobile Mentor; ██████; ██████ BahavioSec; and Orange.   Twilio is not in possession of further information regarding these partnerships, including any licensing or technology transfer / sharing agreements that may have been executed, services / products received or provided, and any related financial provisions.   This information may affect the analysis of a reasonable royalty under this factor.

Twilio contends that additional information concerning TeleSign's non-accused products may be relevant to this analysis.   For example, information concerning the operation, functionality, marketing, target customers, revenue, costs, profits, and usage metrics for non-accused products from 2005 to present may be relevant to an analysis of the contribution of the patented technology of the Asserted Patents.   Per-unit financial information such as revenues, costs, and profits, on a line-item basis, from 2005 to present for non-accused products may be relevant to this analysis.   Further, business plans, marketing plans, and target customer plans or analyses for both the accused and non-accused products may be relevant to the analysis under this factor. TeleSign is in sole possession of information relating to its sales and marketing strategies and information relating to cross-selling of its products.

Twilio contends the following documents may be relevant to the analysis under this factor:   TLS_00002108, TLS_00005587, TLS_00005588, TLS_00000927, TLS_00008508, TLS_00008511,   TLS_00008516,   TLS_00013138,   TLS_00013143,   TLS_00013377, TLS_00015243,   TLS_00015311,   TLS_00015316,   TLS_00015323,   TLS_00015326, TLS_00015366,   TLS_00015375,   TLS_00015380,   TLS_00018193,   TLS_00002018, TLS_00002106,   TLS_00005288,   TLS_00005542,   TLS_00005552,   TLS_00005555, TLS_00005561,   TLS_00005565,   TLS_00005576,   TLS_00005589,   TLS_00008681, TLS_00009119,   TLS_00013143,   TLS_00015243,   TLS_00015344,   TLS_00015588, TLS_00015607,   TLS_00015616,   TLS_00015623,   TLS_00018193,   TLS_00020567,

BAKER BOTTS L.L.P.

1   TLS_00004350,    TLS_00004464,    TLS_00004465,    TLS_00004469,    TLS_00004477,

2   TLS_00004499,    TLS_00004503,    TLS_00004507,    TLS_00004512,    TLS_00004513,

3   TLS_00004523,    TLS_00004527,    TLS_00004529,    TLS_00004540,    TLS_00012760,

4   TLS_00012766,    TLS_00014955,    TLS_00015034,    TLS_00015050,    TLS_00004253,

5   TLS_00004266,    TLS_00004583,    TLS_00004608,    TLS_00008690,    TLS_00008695,

6   TLS_00008697,    TLS_00008699,    TLS_00008704,    TLS_00008740,    TLS_00015126,

7   TLS_00015133, TLS_00015202.

8        Twilio reserves its right to amend and supplement these contentions based on any

9   information obtained during discovery and expert opinions relating to this factor.

10       **N.    *Georgia-Pacific Factor 14: "The opinion testimony of qualified experts"***

12       Fact discovery in this case is in its early stages.  The Court has provided a schedule for

13   damages discovery, during which qualified experts will examine issues concerning the prior art

14   asserted in the case, the validity of the Asserted Patents, TeleSign's infringement of the Asserted

15   Patents, the extent of TeleSign's infringement, any available non-infringing alternatives and the

16   viability of such alternatives, and the proper amount of damages for TeleSign's infringement of

17   the Asserted Patents, among other topics.  Twilio reserves the right to supplement or amend

18   these contentions once qualified experts have provided their opinions regarding the Asserted

19   Patents, including the proper amount of damages for TeleSign's infringement of those patents.

20   In particular, Twilio disclosed a damages expert to TeleSign in this case on June 9 and followed

21   up with counsel for TeleSign on June 15.  *See* Exhibit D.  Twilio asked for TeleSign's consent to

22   disclose its confidential information to the expert on an expedited basis, but neither TeleSign's

23   lead counsel nor anyone else on TeleSign's counsel team would even respond to either of

24   Twilio's emails.  *Id.*  Twilio contends that the opinion of its damages expert will be relevant to

25   this analysis and Twilio is unable to disclose any confidential TeleSign information to its expert

26   as of this date, due to TeleSign's failure to even respond to Twilio's email requests.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

O.      ***Georgia-Pacific Factor 15: "The amount that a licensor (such as the patentee)
and the licensee (such as the infringer) would have agreed upon (at the time
infringement began) if both had been reasonably and voluntarily trying to
reach an agreement; that is, the amount which a prudent licensee – who
desires, as a business proposition, to obtain a license to manufacture and sell a
particular article embodying the patented invention – would have been willing
to pay as a royalty and yet be able to make a reasonable profit and which
amount would have been acceptable by a prudent patentee who was willing to
grant a license"***

Twilio contends that the parties to the hypothetical negotiation would have considered all
of the analyses outlined in these contentions and additional information that is uncovered during
fact and expert discovery in this case.  The parties would have acknowledged that the Asserted
Patents were valid and infringed.  The parties would have considered that the Asserted Patents
are fundamental patents for bridging software developers and telephony communication.  The
parties would have acknowledged that the products and services covered by the Asserted Patents
were commercially successful, profitable, and popular, and represent a significant improvement
over prior art.  The parties would have recognized that they are competitors.

Further, the parties would have had available to them information that is not currently
available to Twilio at this stage in the case, as discussed above.  For example, the parties would
have had detailed information, at least dating back to 2005, on TeleSign's pricing models, actual
and projected quantities sold of the Accused and non-accused Products, and per-unit
profitability, cost, revenue, and other financial information for the Accused and non-accused
Products that will be the subject of fact and expert discovery.  The parties would have had
available monthly or quarterly unit price, unit sales, revenue, and unit cost information
(including detailed line items of what comprises unit costs) per customer from 2005 to present
for each Accused Product and non-accused product.  Further, the parties would have had
available monthly or quarterly profitability (e.g., revenue; costs of goods sold (COGS); selling,
general, and administrative expenses (SG&A); and research and development expenses (R&D),
etc.) and other financial information related to each Accused Product and non-accused product
and their predecessors from 2005 to present.  Further, the parties would have had available
technical specifications and features for each Accused Product and any predecessor.  Further, the
parties would have had information concerning quantities of each Accused Product and non-

BAKER BOTTS L.L.P.

accused product sold by TeleSign over time.  For example, the number of messages sent per month for each Accused Product and the number of subscribers per month for each Accused Product would have been available to the parties.  Further, Twilio contends that information concerning TeleSign's incremental margins on the Accused Products may be relevant to the damages analysis and would have been available to the parties to the hypothetical negotiation. For example, Twilio contends that TeleSign's incremental margins on the Accused Products increase with each message that is sent.  Further, information relating to TeleSign's new self-service access to its communication APIs, including marketing and promotion materials, information relating to any cross-selling or synergistic efforts among TeleSign products, usage metrics, actual and projected per-unit revenue, cost, and profit information, projected and actual quantities sold (e.g., number of messages per month), and analyses concerning target market and target customers may be relevant to the analysis of a reasonable royalty.  Twilio has not located such information in TeleSign's document production, and such information is solely in the possession of TeleSign.  Under the Book of Wisdom, the parties would have had detailed information about BICS' acquisition of TeleSign.  Further, Twilio will consider the opinion testimony of qualified experts in forming its calculation of damages in this case.

Further, Twilio contends that the parties to the hypothetical negotiation would have had information concerning TeleSign's analysis of the switch from SOAP to REST, the factors involved in that decision, any financial analyses or presentations concerning that decision, any customer or developer feedback to TeleSign concerning the SOAP interface and any requests to switch to REST or discussions concerning a potential switch.  Further, the parties would have had access to any information concerning the impact of this switch on TeleSign's usage metrics for the Accused and non-accused Products, including number of message and number of subscribers per month for each Accused Product before and after the transition, per unit revenue, per unit cost and profitability data before and after the transition.  Further, the parties would have had access to any customer / developer feedback concerning the switch.  Further, the parties would have had access to any projections or forecasts concerning how the switch from

BAKER BOTTS L.L.P.

1  SOAP to REST would affect TeleSign, sales, costs, and profitability of the Accused Products.

2  These topics will be the subject of discovery in this case.

3  Further, Twilio contends that the parties to the hypothetical negotiation would have had

4  information at least dating back to 2005 concerning TeleSign's non-accused products, which

5  may be relevant to the analysis of a reasonable royalty.  For example, information dating back to

6  2005 concerning the operation, functionality, marketing, target customers, revenue, costs,

7  profits, and usage metrics for non-accused products may be relevant to an analysis of the

8  contribution of the patented technology of the Asserted Patents.  Per-unit financial information

9  such as revenues, costs, and profits, on a line-item basis, for non-accused products may be

10  relevant as well.  Further, business plans, marketing plans, and target customer plans or analyses

11  for both the accused and non-accused products may be relevant to the analysis of a reasonable

12  royalty. TeleSign is in sole possession of information relating to its sales and marketing

13  strategies and information relating to cross-selling of its products.

14  Based on the information currently available to Twilio, Twilio contends that the parties

15  would have agreed to a royalty with a royalty base that is based on TeleSign's revenue for the

16  Accused Products.  Twilio contends that the Asserted Patents enable the core functionality for

17  each of the TeleSign Accused Products.  Based on information currently available to it, Twilio

18  contends the royalty rate will be a percentage of revenue, or a royalty based on each use of the

19  Accused Products.  Based on information currently available to it, Twilio contends that TeleSign

20  prices the Accused Services on a per-use basis.  Therefore, Twilio contends that a reasonable

21  royalty in this case may be calculated on a per-use basis.  However, Twilio is not in possession

22  of sufficient information to calculate an appropriate royalty rate or damages figure at this stage

23  in the case.

24

25

26

27

28

BAKER BOTTS L.L.P.

Dated: June 20, 2017                    Respectfully submitted,

                                        BAKER BOTTS L.L.P.
                                        SARAH GUSKE
                                        WAYNE STACY
                                        MICHELLE J. EBER
                                        J.B. SCHILLER


                                        */s/ Michelle J. Eber* _____
                                        Michelle J. Eber

                                        *Attorney for Twilio Inc.*

1

2

## CERTIFICATE OF SERVICE

3        I hereby certify that all counsel of record who have consented to electronic service are

4 being served with a copy of this document via electronic mail on June 20, 2017.

5

6                                    */s/ Michelle J. Eber* _____
                                     Michelle J. Eber

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER BOTTS L.L.P.